

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00176-CR

_____

KENDARIUS WILLIAMS, Appellant

V.

THE STATE OF TEXAS

_____

On Appeal from Criminal District Court No. 3
Tarrant County, Texas
Trial Court No. 1632429

_____

Before Sudderth, C.J.; Bassel and Womack, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I. Introduction

Appellant Kendarius Williams appeals his murder conviction for which he was sentenced to fifty years' confinement. Williams raises five points, which we dispose of as follows:

- He argues that the jury charge allowed a nonunanimous verdict, but we follow our precedent and rule against him;

- He contends that the trial court reversibly erred by denying his request for a lesser-included instruction on manslaughter; the evidence, however, reflects that he participated as a party in committing an act clearly dangerous to human life, that he was not guilty solely of the offense of manslaughter, and that he therefore did not qualify for a lesser-included instruction on manslaughter;

- He challenges the trial court's admission of two extraneous shootings as violative of Texas Rules of Evidence 404(b) and 403, but we hold that the evidence was admissible as same-transaction contextual evidence, or alternatively to rebut a defensive issue, and that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice;

- He argues that the trial court reversibly erred by admitting testimony about a video, photographs, and Instagram posts, but we hold (with the exception of State's Exhibits 125 and 127) that the complained-of evidence was relevant, that the probative value was not substantially outweighed by the danger of unfair prejudice, and that any error in admitting State's Exhibits 125 and 127 was harmless; and

- He contends that he received ineffective assistance of counsel when his trial counsel failed to object to the admission of extraneous-offense evidence based on lack of notice, but based on the silent record on this issue, we hold that Williams failed to establish his ineffective-assistance claim.

2

Accordingly, we affirm.

## II. Background

This case involves the shooting of Derrick Johnson, a member of the Grind Hard Gang, by rival gang members Deandre Holmes and Williams, who were part of the Trench Gang. At the heart of the conflict was a girl—Nyazjha Barbee—who had broken up with Holmes and had then started dating Johnson in December 2019. Holmes told Barbee's mother that he did not want Barbee dating Johnson and that he wanted to get back together with her.

Holmes got together with friends and carried out Johnson's murder around 12:30 a.m. on February 6, 2020. But in the hours prior to the murder, Holmes and Williams were involved in several other criminal activities as Jermon Karson drove them around. Karson, who pleaded guilty to murdering Johnson and received a sentence reduction in exchange for his accomplice testimony against Williams, provided the timeline of events.

Karson stated that on February 5, 2020, he had driven his red Toyota RAV4 to pick up Holmes and Williams (whom he had not previously met) at Holmes's house in Arlington and had gone to an apartment complex to get marijuana. When they spotted a gray car, Karson followed it into a neighborhood. Karson pulled up to the gray car, which had parked, and Holmes and Williams shot their 9-millimeter pistols nine or ten times into the gray car before Karson drove off.

3

Karson returned to Holmes's house to pick up Donald Hill and then went to a Shell gas station. The surveillance video from the gas station showed Karson getting out of the RAV4, and he identified Williams as the person who got out wearing a white-and-black Nike jacket.

Karson then drove the group to an apartment complex off Allouette in Arlington about an hour or an hour and a half prior to the incident with Johnson. After Karson backed into a parking spot at the apartment complex, Williams got out of the car, but Karson was unsure where he went. A guy walked over and got in Karson's vehicle; he talked to Holmes about marijuana, and Karson said that Holmes acted as if he was going to give the man money. The man—all of a sudden—hopped out, and Karson heard gunshots outside the vehicle. Karson agreed that the only person outside the vehicle at that point was Williams and that he still had his pistol on him from earlier in the day; Karson believed that Williams had shot at the unknown man.

After leaving the Allouette apartment complex, Karson drove to pick up Jonathan Fletcher (a/k/a Cracker Jack), who got in the back passenger seat behind Holmes. Karson could not recall if Hill was still with them.

Holmes then directed Karson to the apartment complex in Grand Prairie where Johnson lived. Upon entering the complex,[1] they noticed a black car. Johnson

---

[1]Although the timing is not clear, the evidence revealed a February 5, 2020 post on Holmes's Instagram account that said, "I'm posted[.] WTP." Barbee's mother

4

and Barbee were in the black car and had noticed that a red SUV was following them; they believed they were being followed by an undercover police officer because they were driving a stolen vehicle. According to Barbee, Johnson parked the car, and the red SUV drove slowly past as Johnson and Barbee got out of the car.

The red SUV then circled back and stopped when Johnson and Barbee were in the breezeway, with Johnson ten or fifteen feet ahead of Barbee. At that point, Karson heard Holmes roll down the window. Holmes sat on the ledge of the passenger-side window, reaching over the car while he fired shots at Johnson. Karson testified that Williams also shot at Johnson.[2] Karson agreed that Williams had a better angle because by shooting from the back driver's side, he was closest to the victim. Karson testified that Cracker Jack could not get a shot off because Williams was in the way. Karson testified that he had heard ten or twelve shots; Barbee testified that she had heard thirty or forty.

---

explained that "WTP" stands for "what's the play," meaning what is everyone doing. She further explained that what was concerning is that the photo that was posted with that message included the geo tag location showing that Holmes was at Johnson's apartment complex.

[2]Karson did not believe that Williams and Holmes were trying to shoot Barbee. When asked if Williams and Holmes were trying to kill Johnson, Karson responded, "From where I was sitting[ in the RAV4], it looked as if [they were trying to kill Johnson] because he was already ahead of her." But he said, "I guess," when asked if she would have been in the line of fire.

When Karson saw that Johnson was about to fall down because he had been shot in the back, Karson drove away. Karson testified that everyone in his vehicle started celebrating Johnson's death, i.e., that the mission had been successful.

Barbee testified that she tried to drag Johnson to the apartment that he shared with his mother and then gave up and went and got her. Johnson's mother called 911. Paramedics arrived and transported Johnson to the hospital, but he later died. According to the medical examiner who performed the autopsy, his cause of death was a gunshot wound to the back, and his manner of death was homicide.

Police arrived at Johnson's apartment complex around 12:30 a.m. on February 6 and collected fourteen cartridge casings from the area where Johnson had been shot. Two of the casings were .40-caliber Smith & Wesson Hornady fired cartridge casings; these two were a different caliber than the other twelve casings, which were WMA-19 fired cartridge casings. The firearm and tool-mark examiner concluded that all twelve of the 9-millimeter Luger caliber cartridge casings were fired from the same firearm, and the two .40-caliber Smith & Wesson cartridge casings were fired from the same firearm. Neither firearm was recovered.

The next morning, Karson attempted to remove some decal stickers from his vehicle to make it less identifiable, but he was interrupted by law enforcement who took him into custody where he later confessed to his participation in the events of February 5 and 6 and named the gunmen. Karson told Grand Prairie Police Officer Joshua Stelter that Williams and Holmes had used silver-and-black semiautomatic

6

pistols, and Officer Stelter said that the casings found at the scene (9-millimeter and .40-caliber) are common rounds for semiautomatic pistols.

The Grand Prairie Police Department Crime Scene Unit swabbed various objects inside Karson's red Toyota RAV4, including a Sprite can. DNA testing revealed that the DNA profile from the swab of the mouth of the Sprite can that was collected from Karson's car was the same as the DNA profile from Williams's buccal swab.

After Williams was arrested, he agreed to speak with Officer Stelter. Officer Stelter testified that during Williams's first interview, he gave evasive answers and claimed that he had not spoken with Holmes for several weeks prior to Johnson's murder and did not know that Holmes was out of jail, that he had not been around Cracker Jack since 2017, that he had never been in Karson's vehicle and did not know him, and that he had not been in any vehicle the week of the murder because he was at his girlfriend's house playing video games. Williams further stated that his DNA would not be in that car. Williams told Officer Stelter multiple times to check his phone and provided his Instagram username.

Williams admitted knowing Johnson and Holmes and their arguments about Barbee, but Williams said that he would not have helped Holmes kill anybody over a girl and that it was his opinion that Holmes would not do that either. Officer Stelter did not tell Williams that Johnson had been killed over a girl, but Williams offered that information, which was consistent with the knowledge that others (i.e., Barbee

7

and Karson) had of the situation. During Officer Stelter's second interview of Williams, Williams changed his story about being with Holmes from a few weeks prior to just a couple of days before the homicide.

Officer Stelter went through messages that were found on Williams's cell phone. Officer Stelter read a message that was sent at 1:49 a.m. on February 6, stating that he (Williams) had run from the law in Arlington and had just made it home; Officer Stelter was unable to determine to whom the message had been sent. The next message that was sent from Williams's phone stated that he had been "hiding cold" in the "SB yard" since ten; Officer Stelter was unfamiliar with the "SB yard." Based on these texts, Officer Stelter opined that Williams "was absolutely involved in the murder of Mr. Johnson."

Officer Stelter testified that a photo had been created at 1:51 a.m. on February 6, 2020, showing Williams holding a long gun in his right hand and a semiautomatic pistol in his left front pocket. The color of the weapon—a black handgun that also looked somewhat silver—was consistent with the gun description that Karson had provided. Officer Stelter also testified about two other photos—one was taken approximately two weeks before the shooting and the other was taken approximately three months before the shooting—that showed Williams holding a semiautomatic pistol that matched Karson's description of the weapon used by Williams during Johnson's murder.

Officer Stelter was asked about several photos from Williams's Instagram account, which showed him in a white-and-black Nike jacket like the one he was seen wearing in the Shell station's surveillance footage.

One of Williams's Instagram posts, which was dated 4:39 a.m. on February 6, 2020, stated, "It's done, GHG Kane," with a coffin emoji. Officer Stelter interpreted this as Williams's admitting that he had killed Johnson (a/k/a Kane) from the Grind Hard Gang. In a separate post, Williams stated, "IK [I know] we don't FW [f-ck with] each other but tell splurge that I handled GHG Kane for him," followed by a coffin emoji. And following that, Williams identified himself by his nickname, stating, "[T]his is KD cuh." In another post on the same day as the murder, Williams stated, "I killed him last night on 60 . . . ."

After Karson was arrested, a post appeared on Williams's Instagram page at 12:51 p.m. on February 6, 2020; the post had the word "rats" repeated to fill the screen but was later deleted as reflected by the records that were subpoenaed from Instagram. Officer Stelter interpreted this as meaning that a snitch or an informant had told on Williams.

Officer Stelter admitted that he did not know who had typed the messages. But Williams told Officer Stelter that he always had his phone on him, and it was found on his person when he was arrested. Williams never said that his phone had been hacked or that someone had posted or texted using his phone.

9

Karson testified that approximately four months before the trial, while he and Williams were housed in the same jail facility, Williams offered Karson $20,000 to not testify against him.

After hearing the evidence, the jury found Williams guilty of murdering Johnson and assessed his punishment at fifty years' confinement. The trial court sentenced Johnson in accordance with the jury's recommendation, and this appeal followed.

### III. Jury Unanimity

In his first point, Williams argues that the jury charge allowed a nonunanimous verdict in violation of his Sixth Amendment right to a jury trial because the jury charge failed to instruct the jury to decide unanimously whether Williams had committed murder under Texas Penal Code Section 19.02(b)(1) or Section 19.02(b)(2). Williams attempts to distinguish his case from a 1987 Texas Court of Criminal Appeals decision that this court has previously followed, *see Aguirre v. State*, 732 S.W.2d 320, 324–26 (Tex. Crim. App. 1987) (op. on reh'g), and further contends that *Aguirre* was wrongly decided. Because we see no reason to depart from our precedent, we rule against Williams.

### A.    Standard of Review

We must review "all alleged jury-charge error . . . regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). In

reviewing a jury charge, we first determine whether error occurred; if not, our analysis ends. *Id.*

## B. The Indictment and the Jury Charge

The State indicted Williams for murder in two paragraphs that correlated with Texas Penal Code Sections 19.02(b)(1) and (b)(2). *See* Tex. Penal Code Ann. § 19.02(b)(1)–(2). And the jury charge explained the difference between those two subsections as follows:

> [a] person commits the offense of murder if he intentionally or knowingly causes the death of an individual; or

> [a] person commits the offense of murder if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual.

The trial court then charged the jury as follows:

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 6th day of February 2020, in Tarrant County, Texas, the defendant, Kendarius Williams, either acting alone or as a party, . . . did intentionally or knowingly cause the death of an individual, Derrick Johnson, by shooting him with a firearm; OR

> If you find from the evidence beyond a reasonable doubt that on or about the 6th day of February 2020, in Tarrant County, Texas, the defendant, Kendarius Williams, either acting alone or as a party, . . . did then and there intentionally, with intent to cause serious bodily injury to Derrick Johnson, commit an act clearly dangerous to human life, namely, shooting him with a firearm, and thereby cause the death of Derrick Johnson, then you will find the defendant guilty of murder as charged in the indictment.

The charge further stated that "[a]ny verdict you render must be unanimous." The charge concluded with a general verdict form for murder.

11

## C.  The Law on Unanimity

Jury unanimity is required in all criminal cases.  *Thanh Cuong Ngo v. State*, 175 S.W.3d 738, 745 (Tex. Crim. App. 2005).  Simply put, every juror must agree that "the defendant committed the same, single, specific criminal act."  *Id.*  Jurors, however, need not be unanimous about the specific manner and means of how an offense was committed.  *Young v. State*, 341 S.W.3d 417, 422 (Tex. Crim. App. 2011).

This court, on four prior occasions, has rejected Williams's argument—that Sections 19.02(b)(1) and 19.02(b)(2) constitute two separate offenses and that a trial court violates the unanimity requirement by allowing the jury to find a defendant guilty without requiring the jury to agree on which offense the defendant committed.  *See Diko v. State*, 488 S.W.3d 855, 858–59 (Tex. App.—Fort Worth 2016, pet. ref'd);[3] *Lozano v. State*, 359 S.W.3d 790, 821–22 (Tex. App.—Fort Worth 2012, pet. ref'd); *Bundy v. State*, 280 S.W.3d 425, 431–33 (Tex. App.—Fort Worth 2009, pet. ref'd); *Davis v. State*, 268 S.W.3d 683, 710–12 (Tex. App.—Fort Worth 2008, pet. ref'd).  As we stated in *Lozano*, "[P]enal [C]ode [S]ections 19.02(b)(1) and 19.02(b)(2) do not describe different offenses; rather, they set forth alternative methods of committing the same offense."  359 S.W.3d at 821 (citing *Bundy*, 280 S.W.3d at 431–33).  Thus,

---

[3]Justice Lee Ann Dauphinot wrote a short dissenting opinion asserting the same contention that Williams argues; she stated that "in order to convict a defendant of a criminal offense, the jury must unanimously find the defendant guilty of the same offense beyond a reasonable doubt."  *Diko*, 488 S.W.3d at 860 (Dauphinot, J., dissenting).  Diko filed a petition for discretionary review, which the Court of Criminal Appeals refused.

"[t]he jury unanimity requirement is not violated when, as here, the defendant was indicted under a statute providing alternate means of committing the same offense." *Id.* (citing *Bundy*, 280 S.W.3d at 433; *Davis*, 268 S.W.3d at 712).

**D.    Analysis**

Williams contends that this court should reconsider its binding precedent because the foundation of that precedent—*Aguirre*—does not speak decisively to the unanimity issue[4] or because *Aguirre* was wrongly decided.  As noted above, *Aguirre* was decided by the Court of Criminal Appeals in 1987.  As an intermediate court, we are bound to follow the Court of Criminal Appeals's pronouncements.  *See Wiley v. State*, 112 S.W.3d 173, 175 (Tex. App.—Fort Worth 2003, pet. ref'd).

This court's precedent relying on *Aguirre* was handed down in 2008, 2009, 2012, and 2016.  The appellants in each of our cases filed a petition for discretionary review with the Court of Criminal Appeals, thus giving that court the opportunity to correct any errors in the law.  The Court of Criminal Appeals, however, refused each of the petitions.[5]  Moreover, the Court of Criminal Appeals recently reiterated that

---

[4]Williams contends that *Aguirre* is distinguishable because it addresses merger and general verdicts.  *See* 732 S.W.2d at 324–26.

[5]More recently, the Court of Criminal Appeals refused petitions for discretionary review in *Lopez v. State*, 672 S.W.3d 915, 925–26 (Tex. App.—Corpus Christi–Edinburg 2023, pet. ref'd) (rejecting appellant's argument that (1) the subsections of Section 19.02(b) constitute separate offenses that require jury unanimity and (2) the differing mental states in each subsection of the murder statute require jury unanimity), and *Lazarine v. State*, No. 01-19-00982-CR, 2021 WL 5702182, at *8–9 (Tex. App.—Houston [1st Dist.] Dec. 2, 2021, pet. ref'd) (mem. op., not

13

"[a]lternate manner and means of committing the same offense may be submitted to the jury without violating the right to a unanimous jury verdict." *Floyd v. State*, No. PD-0148-23, 2024 WL 4757855, at *5 (Tex. Crim. App. Nov. 13, 2024); *see Martinez v. State*, 129 S.W.3d 101, 103 (Tex. Crim. App. 2004) ("The unanimity requirement is not violated by instructing the jury on alternate theories of committing the same offense . . . ."). We see no reason to depart from our precedent and therefore decline Williams's request to overrule it.

Here, just as in *Diko*, the jury was authorized in the charge to find Williams guilty of murder if he intentionally or knowingly caused Johnson's death or if Williams, with intent to cause serious bodily injury to Johnson, committed an act clearly dangerous to human life that caused Johnson's death. The jury returned a general verdict finding Williams guilty of the offense of murder. Based on this court's binding precedent interpreting the murder statute, we hold that the trial court did not err by submitting its charge to the jury. *See Diko*, 488 S.W.3d at 859–60; *Lozano*, 359 S.W.3d at 821–22; *Bundy*, 280 S.W.3d at 431–33; *Davis*, 268 S.W.3d at 710–12.

We overrule Williams's first point.

---

designated for publication) (employing Judge Cochran's eighth-grade grammar test and concluding that the gravamen of the crime—death—is the same under both Section 19.02(b)(1) and (b)(2) and that the theories are alternative manner and means, which do not require unanimity). Williams raised comparable arguments in his brief, and we similarly reject them.

## IV. Lesser-Included-Offense Instruction

In his second point, Williams argues that the trial court reversibly erred by denying his request for an instruction on the lesser-included offense of manslaughter. Looking at the evidence as a whole, especially in light of the law-of-parties instruction, we cannot conclude that Williams was entitled to an instruction on the lesser-included offense of manslaughter.

### A. The Standard of Review and the Lesser-Included-Offense Rubric

Appellate courts review a trial court's refusal to submit a lesser-included-offense instruction for an abuse of discretion. *Chavez v. State*, 666 S.W.3d 772, 776 (Tex. Crim. App. 2023). A trial court abuses its discretion when its decision is arbitrary—i.e., without reference to any guiding rules and principles—or is so clearly wrong that it lies outside the zone of reasonable disagreement. *Velasquez v. State*, No. 05-16-00333-CR, 2018 WL 416494, at *6 (Tex. App.—Dallas Jan. 16, 2018, no pet.) (mem. op., not designated for publication).

We analyze two steps to determine whether an appellant was entitled to a lesser-included-offense instruction: (1) Are the elements of the lesser-included offense included within the proof necessary to establish the charged offense's elements? (2) Is there evidence in the record from which a jury could find the defendant guilty of only the lesser-included offense? *State v. Meru*, 414 S.W.3d 159, 161 (Tex. Crim. App. 2013); *Hall v. State*, 225 S.W.3d 524, 528, 535–36 (Tex. Crim. App. 2007); *Rousseau v. State*, 855 S.W.2d 666, 672–73 (Tex. Crim. App. 1993). Here,

15

because the State correctly concedes that manslaughter qualifies as a lesser-included offense, we focus only on the second question.[6] *See Stredic v. State*, 663 S.W.3d 646, 652 (Tex. Crim. App. 2022) (listing manslaughter as a lesser-included offense of murder).

In considering this second question—whether there is evidence from which a jury could find Williams guilty only of manslaughter—we make a factual determination based on all the evidence presented at trial. *See Meru*, 414 S.W.3d at 163; *see Ritcherson v. State*, 568 S.W.3d 667, 677 (Tex. Crim. App. 2018) (admonishing that the court cannot make a lesser-included determination from isolated evidence in a vacuum). We must consider whether the record contains "(1) evidence that directly refutes or negates other evidence establishing the greater offense and raises the lesser-included offense or (2) evidence that is susceptible to different interpretations, one of which refutes or negates an element of the greater offense and raises the lesser offense." *Ritcherson*, 568 S.W.3d at 671; *see Chavez*, 666 S.W.3d at 778 (setting out how trial courts determine whether to submit a lesser-included instruction).

Because the jury charge included instructions on the law of parties, the evidence is reviewed on appeal in light of the law of parties to determine whether Williams was guilty of committing only the crime of manslaughter. As stated by the First Court of Appeals,

---

[6]Courts are not bound by any agreement or concessions by the parties on an issue of law. *Oliva v. State*, 548 S.W.3d 518, 520 (Tex. Crim. App. 2018).

[W]hen a crime involves multiple perpetrators, we must take into account the law of the parties in considering whether the evidence raises the issue that the defendant is guilty of only a lesser-included offense. *Yzaguirre v. State*, 394 S.W.3d 526, 527–30 (Tex. Crim. App. 2013). Under the law of . . . parties, a defendant is criminally responsible for the conduct of other persons if he acts with the intent to promote or assist in the commission of the offense and solicits, encourages, directs, aids, or attempts to aid the others committing the offense. [Tex.] Penal [Code Ann.] §§ 7.01, 7.02(a)(2). So, when the law of . . . parties applies, the fact that the defendant did not himself commit the offense in question is immaterial to his guilt, and he is not entitled to an instruction on the lesser-included offense. *See id.*; *Yzaguirre*, 394 S.W.3d at 531.

*Herrera-Hernandez v. State*, No. 01-21-00218-CR, 2023 WL 307499, at *8 (Tex. App.—Houston [1st Dist.] Jan. 19, 2023, pet. ref'd) (mem. op., not designated for publication).

## B. Analysis

Here, the trial court could have reasonably concluded that no evidence supported the inference that if Williams was guilty of an offense, he was guilty only of manslaughter, i.e., recklessly causing Johnson's death by shooting him. *See generally* Tex. Penal Code Ann. § 19.04(a) (stating that the mens rea of manslaughter is recklessly causing an individual's death).

Contrary to Williams's argument that this was "a sporadic drive-by shooting," the evidence showed that Holmes had a plan to seek revenge against Johnson for dating Barbee and that he wanted her back, and Holmes carried out his plan while he had an armed Williams with him. Holmes directed Karson to drive to Johnson's apartment complex, and Holmes's Instagram showed that he was posted at Johnson's

17

apartment complex on February 5; the murder occurred before 12:30 a.m. on February 6. Fourteen cartridge casings, consisting of two different types, were found at the scene and were identified as common rounds for semiautomatic pistols like Williams's. According to Karson, he did not drive away until Johnson started to fall down, and then the vehicle's occupants celebrated in having satisfactorily completed their mission.[7] Williams's phone showed that during the hours after the incident, a message was sent stating that he had run from the law and had been hiding, a photo

---

[7]This conduct belies Williams's other argument within his second point that relies on Holmes's after-the-fact apology. Williams points to Barbee's mother's testimony that Holmes had apologized to her after the incident and had stated that "it was not supposed to happen like that"; Barbee's mother speculated that Holmes meant that they did not mean to kill Johnson. We, however, cannot rely on speculation. *See Parsons v. State*, No. 02-24-00036-CR, 2025 WL 211349, at *3 (Tex. App.—Fort Worth Jan. 16, 2025, no pet.) (mem. op., not designated for publication) ("Meeting th[e] threshold [to be entitled to a lesser-included instruction] requires more than mere speculation[;] it requires affirmative evidence that both raises the lesser-included offense and negates or refutes an element of the greater offense.").

Moreover, as pointed out by the State, "[e]vidence that Holmes may have regretted killing Johnson does not serve to negate his (or Williams's) clear intent to, at a minimum, cause Johnson serious bodily injury and [their commission of] an act clearly dangerous to human life that ultimately did cause Johnson's death." *See Cavazos v. State*, 382 S.W.3d 377, 385 (Tex. Crim. App. 2012) ("Pulling out a gun, pointing it at someone, pulling the trigger twice, fleeing the scene (and the country), and later telling a friend 'I didn't mean to shoot anyone' does not rationally support an inference that [the] [a]ppellant acted recklessly at the moment he fired the shots."). Williams, without citing any authority, further argues that the fact that Johnson was hit only once, combined with Holmes's "admission that they were not supposed to kill Johnson," is sufficient to show that Williams acted only recklessly. Based on the preceding explanation, as well as the medical examiner's testimony that firing even one bullet into another human would constitute an act clearly dangerous to human life (thus fitting within the (b)(2) definition of murder with which Williams was charged in the indictment), we disagree with Williams's unsupported argument.

had been created showing Williams holding a long gun in his right hand and a semiautomatic pistol in his left front pocket, and multiple posts were made on his Instagram account taking credit for having killed Johnson.

Moreover, even if the evidence could be construed as a drive-by shooting, Williams's conduct would still constitute an intentional act. The Fourteenth Court of Appeals has analyzed whether a drive-by shooting was intentional and concluded that the evidence was sufficient to show that it was:

> Although witnesses saw only the front-seat passenger in the mini-van fire a gun, appellant, the back-seat passenger, confessed that he was at the scene of the murder, and that he fired his gun but did not know whether the bullet from his gun was the one that had hit the child. Furthermore, evidence recovered from the scene of the shooting established that two different guns were fired for a total of at least five shots. The record also contains evidence that this shooting was in retaliation for an earlier, gang-related shooting. The evidence supports the inference that appellant knew his shooting the gun in the general direction of a group of people including the four-year-old victim was reasonably certain to result in a death.

*Rojas v. State*, 171 S.W.3d 442, 447 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd); *see Medina v. State*, 7 S.W.3d 633, 638–39 (Tex. Crim. App. 1999) (op. on reh'g) (disagreeing with appellant's argument that "because the murders were committed in a 'random' drive-by-shooting there was evidence that . . . if he [had] killed the victims, it was without the specific intent to kill" and holding that appellant was not entitled to a lesser-included-offense instruction).

Furthermore, based on the jury instruction, "we must take into account the law of the parties in considering whether the evidence raises the issue that [Williams] is

guilty of only a lesser-included offense." *See Yzaguirre*, 394 S.W.3d at 527–30. As discussed above, the evidence shows that Johnson was murdered while walking to the apartment that he shared with his mother and that both Holmes and Williams fired shots—one of which fatally struck Johnson. Even if the jury believed that it was Holmes, not Williams, who had fired the shot that killed Johnson, the evidence shows that Williams was simultaneously firing shots and that the silver-and-black pistol that he had with him that night could fire bullets like those found at the scene. Williams has identified no evidence in the record suggesting that he was not acting in concert with Holmes when they shot at Johnson. *Cf. Nealey v. State*, No. 01-15-00999-CR, 2017 WL 3389636, at *9 (Tex. App.—Houston [1st Dist.] Aug. 8, 2017, pet. ref'd) (mem. op., not designated for publication) (concluding that appellant was not entitled to lesser-included-offense instruction because appellant assisted in the charged offense). Taking into account the law of parties, as we must when determining if the trial court properly denied a requested instruction on a lesser-included offense, Karson's testimony that both Holmes and Williams fired shots at Johnson and celebrated when he fell, as well as the evidence from Williams's phone, does not negate the charged offense of murder and raise the lesser offense of manslaughter.

We therefore overrule Williams's second point.

## V. Admission of Extraneous-Offense Evidence

In his third and fourth points, Williams argues that the trial court reversibly erred when it admitted extraneous-offense evidence. Specifically, he complains of the

evidence of the two prior shootings and the admission of testimony, photographs, and Instagram posts—twenty exhibits in total—that depicted him with a pistol and/or wearing a white-and-black Nike jacket or that included messages indicating his involvement with planning shootings or shooting people. After setting forth the standard of review and applicable law, we discuss each of Williams's arguments and rule against him.

## A. Standard of Review

We review a trial court's decision to admit or exclude evidence for an abuse of discretion, *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018), which was previously defined above. If the trial court's evidentiary ruling is correct on any applicable theory of law, we will not disturb it. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

## B. Applicable Law

We borrow from the First Court of Appeals's summary of the law on the admissibility of extraneous-offense evidence:

> An extraneous offense is "any act of misconduct, whether resulting in prosecution or not, which is not shown in the charging instrument and which was shown to have been committed by the accused." *Martinez v. State*, 190 S.W.3d 254, 262 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) [(op. on reh'g)] (quoting *Worley v. State*, 870 S.W.2d 620, 622 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd)). Texas Rule of Evidence 404(b) prohibits admission of extraneous-offense evidence during the guilt–innocence stage of trial to prove that a defendant committed a charged offense in conformity with a bad character. Tex. R. Evid. 404(b)(1) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion

21

the person acted in accordance with the character."); *see also Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). Such evidence may be admissible, however, when it has "relevance apart from character conformity," such as proving "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Tex. R. Evid. 404(b)(2); *see also Devoe*, 354 S.W.3d at 469.

Even when extraneous-offense evidence is admissible under Rule 404(b), it may still be inadmissible under Texas Rule of Evidence 403 if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. Tex. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence.").

*Harling v. State*, No. 01-22-00216-CR, 2022 WL 17982138, at *3 (Tex. App.—Houston

[1st Dist.] Dec. 29, 2022, pet. ref'd) (mem. op., not designated for publication); *see*

*Gigliobianco v. State*, 210 S.W.3d 637, 640–42 (Tex. Crim. App. 2006) (discussing Rule

403).

Additionally, we have previously expounded on how Rule 403 favors admission

of relevant evidence:

"Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence is more probative than prejudicial." *James*[ *v. State*], 623 S.W.3d [533,] 546–47 [(Tex. App.—Fort Worth 2021, no pet.)] (first citing *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 199[1]) (op. on reh'g); and then citing *Emich*[ *v. State*, No. 02-18-00059-CR], 2019 WL 311153, at *7[ (Tex. App.—Fort Worth Jan. 24, 2019, pet. ref'd) (mem. op., not designated for publication)]). Thus, the balance in evaluating the admission of evidence under Rule 403 "is always slanted toward admission of relevant evidence." *Fernandez v. State*, No. 02-18-00483-CR, 2020 WL 1057323, at *6 (Tex. App.—Fort Worth Mar. 5, 2020, pet. ref'd) (mem. op., not designated for publication) (citing *De La Paz*, 279 S.W.3d at 343 & n.17). Because of this presumption, it is the burden of the party opposing the admission of the

22

evidence to show that the evidence's probative value is substantially outweighed by one or more of the dangers listed in Rule 403. *Gaulding*[ *v. State*, No. 02-21-00096-CR], 2022 WL 17986026, at *5[ (Tex. App.— Fort Worth Dec. 29, 2022, pet. ref'd) (mem. op., not designated for publication)]; *James*, 623 S.W.3d at 547.

*Baxter v. State*, No. 02-22-00258-CR, 2023 WL 8268292, at *10 (Tex. App.—Fort Worth Nov. 30, 2023, pet. ref'd) (mem. op., not designated for publication).

And the Texas Court of Criminal Appeals has instructed that

[b]efore excluding evidence, a court must assess the balance of factors in Rule 403 including:

> • how compellingly evidence of the extraneous misconduct serves to make more or less probable a fact of consequence—in other words, its inherent probativeness . . . [;]

> • the potential the ["]other crimes, wrongs, or acts["] have to impress the jury in some irrational but nevertheless indelible way . . . [;]

> • how much trial time . . . the proponent need[s] to develop evidence of the extraneous misconduct, such that the attention of the factfinder will be diverted from the indicted offense . . . [; and]

> • how great . . . the proponent's ["]*need*["] is] for the extraneous transaction.

*Inthalangsy v. State*, 634 S.W.3d 749, 758 (Tex. Crim. App. 2021) (citing *Montgomery*, 810 S.W.2d at 389–90).

If we conclude there was error in admitting the evidence, we must perform a harm analysis. *See* Tex. R. App. P. 44.2. Generally, the erroneous admission or exclusion of evidence is nonconstitutional error governed by Rule 44.2(b) if the trial

23

court's ruling merely offends the rules of evidence. *See Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *see also Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018); *Walters v. State*, 247 S.W.3d 204, 222 (Tex. Crim. App. 2007) (holding exclusion of evidence supporting defendant's defensive theory was nonconstitutional error when it did not prevent defendant from presenting a defense). Likewise, the erroneous refusal of a contemporaneous limiting instruction is nonconstitutional error. *See Jones v. State*, 119 S.W.3d 412, 424–25 (Tex. App.—Fort Worth 2003, no pet.). Exclusion of evidence obtained in violation of Article I, Section 9 of the Texas constitution, is exclusively a function of statute—Code of Criminal Procedure Article 38.23—and is reviewed for nonconstitutional harm under Rule 44.2(b). *Holder v. State*, 639 S.W.3d 704, 707 (Tex. Crim. App. 2022).

Because the error is not constitutional, we apply Rule 44.2(b). Tex. R. App. P. 44.2(b). Rule 44.2(b) requires us to disregard any nonconstitutional error that does not affect appellant's substantial rights. *Id.* A substantial right is affected when the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005); *see King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if the appellate court has a fair assurance from an examination of the record as a whole that the error did not influence the jury or that it had but a slight effect. *Macedo v. State*, 629 S.W.3d 237, 240 (Tex. Crim. App. 2021). In deciding that

question, we consider (1) the character of the alleged error and how it might be considered in connection with other evidence, (2) the nature of the evidence supporting the verdict, (3) the existence and degree of additional evidence indicating guilt, and (4) whether the State emphasized the complained-of error. *Id.*; *Motilla v. State*, 78 S.W.3d 352, 355–56 (Tex. Crim. App. 2002). We may also consider the jury instructions, the State's theory and any defensive theories, closing arguments, and even voir dire, if applicable. *Haley*, 173 S.W.3d at 518–19; *Motilla*, 78 S.W.3d at 355–56.

### C. Admitting Evidence of Prior Shootings Was Not an Abuse of Discretion

In his third point, Williams argues that the trial court reversibly erred when it admitted evidence that he was involved in two extraneous shootings that occurred immediately prior to Johnson's murder because the evidence was prohibited by Rule 404(b) and Rule 403. Williams contends that the State spent an inordinate amount of time and effort to convince the jury that he was a "shooter"—"a gang member who must have intentionally killed . . . Johnson because that's just the kind of guy he is." As explained below, evidence of the two prior shootings was admissible as same-transaction contextual evidence and to rebut a defensive theory, and the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.

### 1.    Law on Same-Transaction Contextual Evidence

In a prior decision, we have explained when extraneous-offense evidence may be admitted:

> Extraneous-offense evidence may . . . be admissible as same-transaction contextual evidence. *See Prible v. State*, 175 S.W.3d 724, 732 (Tex. Crim. App. 2005). "Same-transaction contextual evidence results when an extraneous matter is so intertwined with the State's proof of the charged crime that avoiding reference to it would make the State's case incomplete or difficult to understand." *Id.* The purpose of same-transaction contextual evidence "is to put the instant offense in context." *Swarb v. State*, 125 S.W.3d 672, 681 (Tex. App.—Houston [1st Dist.] 2003, pet. dism'd). The Texas Court of Criminal Appeals has stated that "it has long been the rule in this State that the jury is entitled to know all relevant surrounding facts and circumstances of the charged offense; an offense is not tried in a vacuum." *Moreno v. State*, 721 S.W.2d 295, 301 (Tex. Crim. App. 1986). Same-transaction contextual evidence "is admissible only when the offense would make little or no sense without also bringing in the same transaction evidence." *Wyatt*[ *v. State*], 23 S.W.3d [18,] 25 [(Tex. Crim. App. 2000)] (quotation marks omitted).

*Coleman v. State*, No. 02-18-00471-CR, 2020 WL 241975, at *12 (Tex. App.—Fort Worth Jan. 16, 2020, no pet.) (mem. op., not designated for publication).

### 2.    What the Record Shows

Outside the jury's presence, the parties questioned Karson about the two prior shootings, and at the conclusion of that questioning, the State urged that the evidence was admissible as same-transaction contextual evidence and that the prejudicial nature of contextual evidence rarely renders it inadmissible. Williams objected, contending that the evidence of the two prior shootings was not substantively related to Johnson's murder (i.e., appearing to raise a Rule 404(b) objection) and that it was

26

more prejudicial than probative (i.e., appearing to raise a Rule 403 objection). The trial court allowed the State to go into the two prior shootings.

### 3. Rule 404(b) Analysis

Williams argues on appeal that Karson's testimony regarding the two prior shootings does not constitute same-transaction contextual evidence because (1) they were "completely unrelated" to Johnson's murder, (2) the extraneous shootings were motivated by buying marijuana and possibly stealing from the buyers, and (3) the prior shootings involved different people (i.e., Hill versus Cracker Jack as passengers in the vehicle).

Contrary to Williams's arguments, and as noted by the State, the prior shootings provide necessary context for how the individuals involved in the murder (Karson, Holmes, and Williams) came together to commit the offense, especially because Karson testified that he had not previously met Williams. As the State noted, "Because they were continuously together from the time Karson picked [up] Williams and Holmes . . . through the offense, the jury would naturally wonder what they did throughout the day." *See Inthalangsy*, 634 S.W.3d at 757 (holding evidence of extraneous murder admissible as same-transaction contextual evidence because without it, a "juror would naturally wonder what [had] happened" to the individual); *Devoe*, 354 S.W.3d at 470 (holding evidence of extraneous murder admissible as same-transaction contextual evidence when appellant "did not rest between incidents").

27

Karson's testimony about the two prior shootings, when paired with Johnson's murder, reveals a multi-hour crime spree interrupted only by a brief stop at a gas station between the first and second shootings. Plus, the second shooting occurred only an hour and a half before Johnson's murder, and the prior shootings provide context for the gas-station surveillance video showing that Williams had been with Karson and Holmes prior to Johnson's murder. This crime spree was part of the surrounding facts and circumstances of the charged offense and put Johnson's murder in context. *See Devoe*, 354 S.W.3d at 469; *Coleman*, 2020 WL 241975, at *14.

We hold that the trial court's admission of Karson's testimony about the two prior shootings as same-transaction contextual evidence was within the zone of reasonable disagreement.[8]

---

[8]Additionally, the record shows that Karson's testimony about the prior shootings belies Williams's statement to Officer Stelter that he had not spoken with Holmes for several weeks (which he later changed to state that he had not spoken to Holmes for a couple of days before the homicide), that he had not been around Cracker Jack since 2017, that he had never been in Karson's vehicle and did not know him, and that he had not been in any vehicle the week of the murder because he was at his girlfriend's house playing video games. We hold, in the alternative, that the two prior shootings were admissible to rebut Williams's statements and his defensive theory of alibi. *See Wheeler v. State*, 67 S.W.3d 879, 886–87 (Tex. Crim. App. 2002) (holding that admission of extraneous-offense testimony was relevant to rebut defensive theories of lack of opportunity or impossibility); *Dickey v. State*, 646 S.W.2d 232, 234 (Tex. Crim. App. 1983) (holding it was proper to admit evidence of an extraneous offense that had occurred within five days of the primary offense because appellant raised the defensive theory of alibi); *Albrecht v. State*, 486 S.W.2d 97, 101 n.6 (Tex. Crim. App. 1972) (collecting cases in which extraneous crime evidence was admitted to refute a defensive theory raised by the accused).

28

### 4. Rule 403 Analysis

Williams concedes that the "similarity between the extraneous shootings and the shooting of Johnson, as well as the timing between them, may heighten the probative value to something more than zero" but contends that the similarity and timing do not render the prior shootings relevant and necessary to the State's case. Williams further argues that "the similarities and timing also heighten the prejudicial effect and tendency to confuse the issues." Because "the prejudicial nature of contextual evidence rarely renders such evidence inadmissible, as long as it set[s] the stage for the jury's comprehension of the whole criminal transaction," *see Coleman*, 2020 WL 241975, at *16 (quoting *Smith v. State*, 316 S.W.3d 688, 699 (Tex. App.—Fort Worth 2010, pet. ref'd)), we disagree with Williams's arguments.

Applying the Rule 403 factors to the facts of this case, we reach the following conclusions:

- Probative value—The evidence of Williams's participation in the two shootings during the hours preceding Johnson's murder tends to make it more probable that Williams intended to kill Johnson or that Williams intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused Johnson's death, which are elements of the charged offense. Substantial circumstantial evidence supports the inference that Williams was responsible for Johnson's death as a principal or as a party. This factor weighs heavily in favor of admission.

- Unfair prejudice—There was a slight risk that the jury would be confused that Williams was on trial for shooting at the gray vehicle or at the person who briefly sat in the RAV4 at the Allouette apartments. However, the names of the victims were never shared nor were any

29

emotional details given about those incidents, and it is unlikely that any such confusion would have had an irrational effect on the jury or would have led the jury to make its decision on an improper basis. Other evidence strongly supported a finding that Williams and Holmes cooperated to murder Johnson—the murder victim listed on the indictment. While evidence of the two prior shootings may have had a slight emotional impact on the jury, there is no reason to think it outweighed the emotional impact of the evidence proving Johnson's death. No photos of the prior shooting victims or the scenes were shown to the jury, and Officer Stelter testified that Williams was not charged for the two shootings that occurred prior to Johnson's murder. This factor weighs slightly in favor of admission.

- Amount of trial time consumed—The State did not spend an inordinate amount of time on evidence related to the two prior shootings. The State called twelve witnesses, but only Karson and Officer Stelter testified about the two prior shootings. Williams points to two short paragraphs out of the State's approximately twelve-page closing argument during which the State mentioned the prior shootings. Most of the trial testimony and argument concerned the conflict between Holmes and Johnson; Johnson's murder; and the evidence that was found at the scene, in the RAV4, and on Williams's phone. Again, no photographs of the prior shootings were shown. This factor weighs in favor of admission.

- State's need—The State's need for the evidence was high. As previously noted, the conflict over Barbee involved Holmes and Johnson; Williams was an outsider. And Barbee was unable to identify the people who had fired the shots. This evidence allowed the State to strengthen its murder case by showing that Williams had shot two other people within hours of Johnson's murder. But the evidence was not cumulative of other evidence presented because it showed how Williams participated as a party and as a principal in other shootings during the crime spree and showed a pattern of shooting at particular individuals, not merely spraying bullets haphazardly to see where they might hit. This factor weighs in favor of admission.

Based on the above balancing of the Rule 403 factors, the probative value of the evidence of the two prior shootings was not substantially outweighed by the risk

30

of unfair prejudice. *See Inthalangsy*, 634 S.W.3d at 758–59; *Coleman*, 2020 WL 241975, at *18.

### 5. Conclusion on the Admissibility of the Two-Prior-Shootings Evidence

Having reviewed the admissibility of the evidence of the two prior shootings under Rule 404(b) and Rule 403, we hold that the trial court did not abuse its discretion by admitting such evidence.[9] Accordingly, we overrule Williams's third point.

### D. Admission of Photographs and Testimony

In his fourth point, Williams argues that the trial court reversibly erred when it admitted testimony about a video, photographs, and Instagram posts because the evidence was prohibited by Rules 404 and 403 and because some of it was also inadmissible under Rules 401 and 402. Williams generally argues that "most of the evidence is irrelevant in that the content originated weeks or months prior to the offense at hand, and/or Mr. Williams cannot be identified as the person in the photograph or the author of the post[s]." Williams further argues that the evidence bears no relevance to Johnson's murder and was introduced solely to persuade the

---

[9]Williams does not argue that he was harmed by the admission of the two-prior-shootings evidence, and having concluded there was no error in admitting the evidence, we need not discuss harm. *See Ibanez-Barrera v. State*, No. 04-23-00011-CR, 2025 WL 782698, at *6 (Tex. App.—San Antonio Mar. 12, 2025, no pet. h.) (mem. op., not designated for publication) ("Finding no error, we need not address harm."); *Ray v. State*, No. 05-23-01076-CR, 2024 WL 4834397, at *4 (Tex. App.—Dallas Nov. 20, 2024, no pet.) (mem. op., not designated for publication) ("Because there was no error, we need not conduct a harm analysis."); *see also* Tex. R. App. P. 47.1.

jury to convict Williams because of the "bad act" of possessing weapons. As explained in more detail below, we conclude that each of the complained-of exhibits (sans State's Exhibits 125 and 127) was relevant and that the probative value was not outweighed by the danger of unfair prejudice and that any error in admitting State's Exhibits 125 and 127 was harmless.

The State noted in its brief that it agrees with Williams's description of the complained-of evidence, so we set forth that list here, sans record references, and include analysis under each exhibit or group of exhibits:

(1) State's Exhibit 5: A photograph that "someone took" on [Barbee's mother's] phone, depicting Mr. Williams, Holmes, and "Cuedell" (Holmes'[s] "unclaimed brother," or close friend), all holding guns. The photo was taken in 2019, while Holmes was dating Nyazjha Barbee.

(2) Testimony from [Barbee's mother] that Holmes [had] sent her a video on Instagram depicting Holmes and Mr. Williams on February 6, 2020, sitting in a car with handguns. Holmes said in the video, "I'm looking for Maine [Frederick Penn.]" . . . Mr. Williams did not speak in the video, [Barbee's mom] saw no one else in the video, and she did not know what kind of car it was.

- Williams argues that State's Exhibit 5 was taken months before Johnson's murder, has no bearing on any relevant issue in the case, and is excludable under Rule 403 because it has nearly zero probative value due to the timeframe when it was created.[10] Similarly, Williams contends that Barbee's mother's testimony about the video depicting Holmes and Williams is irrelevant, constitutes character evidence, and is excludable under Rule 403 as more prejudicial than probative. Williams's statement to Officer Stelter created the impression that he had not had much

---

[10]We will conduct a Rule 403 analysis after we have completed our relevance analysis as to each complained-of piece of evidence.

32

contact with Holmes because he believed that he was in jail; these two pieces of evidence were therefore relevant to show Williams had spent time with Holmes and that Williams was participating in Holmes's plans on the day of Johnson's murder. The two pieces of evidence thus rebut Williams's statements about his relationship with Holmes. The trial court's decision to admit these exhibits was thus within the zone of reasonable disagreement.

(3) <u>State's Exhibit 109</u>: Screen[]shot of messages sent from Mr. Williams'[s] phone to an unknown person at 1:49 a[.]m[.] on February 6, 2020, stating[,] "Ran from laws in Arlington juss made I home," and "I been hiding cold Inna sb yard since 10."

- After Williams objected to improper authentication of State's Exhibit 109, the State said that it would authenticate the exhibit through Officer Stelter, and the trial court deferred ruling on the exhibit's admission. When State's Exhibit 109 was offered during Officer Stelter's testimony, Williams objected based on "relevance and authentication." Williams makes no specific argument in his brief related to State's Exhibit 109, and he failed to object on the Rule 404 and 403 grounds that he argues generally within his fourth point. We hold that he failed to preserve this complaint for appeal. *See Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App. 2009) ("A complaint will not be preserved if the legal basis of the complaint raised on appeal varies from the complaint made at trial.").

(4) <u>State's Exhibit 110</u>: Photo from Mr. Williams'[s] phone, created at 1:51 a.m. on February 6, 2020, depicting Mr. Williams holding a long gun in his right hand [and] a semiautomatic pistol in his pocket with his left hand.

- This exhibit is discussed below with State's Exhibits 128, 129, 131, and 132.

(5) <u>State's Exhibits 114 and 115</u>: Photo from Mr. Williams'[s] phone, dated December 10, 2019, depicting Mr. Williams holding what appears to be a black semiautomatic pistol with an extended magazine.

33

(6) <u>State's Exhibits 116 and 117</u>: Photo from Mr. Williams['s] phone, dated January 21, 2020, depicting Mr. Williams holding what appears to be a black semiautomatic pistol with what looks like a laser.

(7) <u>State's Exhibits 118 and 119</u>: Photo from Mr. Williams['s] phone, dated November 10, 2019, depicting Mr. Williams holding what appears to be a small shotgun in his right hand, and a silver pistol with a laser in his left hand.

- Williams argues that the photographs in State's Exhibits 114, 116, and 118 and the data corresponding to each exhibit (i.e., State's Exhibit 115 shows the date that State's Exhibit 114 was created, State's Exhibit 117 shows the date that State's Exhibit 116 was created, and State's Exhibit 119 shows the date that State's Exhibit 118 was created), reflect that they were created weeks or months before Johnson's murder. Because of the dates, Williams argues that the photographs are not relevant and that the probative value is "nearly zero." Contrary to Williams's contentions, the photographs were relevant because they corroborated Karson's description of the gun that Williams used during the February 5 to 6 crime spree. It was therefore within the zone of reasonable disagreement for the trial court to admit these exhibits.

(8) <u>State's Exhibit[s] 120, 121[,] and 122</u>: Screenshots from Mr. Williams'[s] Instagram account depicting a young man, with his face covered, wearing a black[-]and[-]white Nike jacket similar to the jacket Mr. Williams was wearing on February 6, 2020.

(9) <u>State's Exhibit 124</u>: [Instagram Business Record] Photo of a young man in a ski mask wearing the black[-]and[-]white Nike jacket and holding a silver semiautomatic handgun, with the words "November 19, 2019" written on it, but timestamped January 12, 2020.

- State's Exhibit 120, 121, and 124—no matter the dates they were taken—are photos depicting a male wearing a white jacket with a large black Nike swoosh on it. Williams claims that the photos are not relevant because the male's

face is not shown. The face, however, is not the focus. Instead, the photos—from Williams's own Instagram account—were probative of the fact that Williams owned a white-and-black Nike jacket just like the one he was seen wearing in the surveillance video on the day of the offense. *See Luster v. State*, No. 05-23-00307-CR, 2025 WL 354198, at \*10 (Tex. App.—Dallas Jan. 31, 2025, pet. filed) (mem. op., not designated for publication) (stating that the evidence carried significant inherent probative force as to identity because the distinctive clothing worn by the two men tied the three offenses together). The trial court's decision to admit the photos under Rule 404(b) was thus within the zone of reasonable disagreement.

- As to State's Exhibit 122, which is a photo of the back of a male who is wearing a white jacket with a large black Nike swoosh on it, Williams's counsel stated that the photo clearly went to identity and that he did not "necessarily have any objection to that." Because Williams did not lodge an objection to the photo, no complaint is preserved for our review. *See generally* Tex. R. App. P. 33.1(a).

(10) <u>State's Exhibit 125</u>: Photo from Mr. Williams'[s] Instagram account dated January 29, 2020, depicting a silver[-]and[-]black semiautomatic pistol with an extended magazine laying across an unknown person's lap.

- Williams argues that the photo is wholly irrelevant because it shows a silver-and-black pistol resting on someone's legs. The photo's data shows that the author is "Brand Ambassador" and that Williams was a recipient of the photo. Even assuming the trial court erred by admitting this photo, Williams has not demonstrated (or even mentioned) that its admission harmed him, and we fail to see how his substantial rights could have been impaired by the admission of this single photograph and conclude that any error was harmless. *See Austin v. State*, No. 05-98-01315-CR, 1999 WL 810136, at \*1 (Tex. App.—Dallas Oct. 12, 1999, no pet.) (not designated for publication) (concluding any error in admitting a photograph of the complainant was harmless).

35

(11) <u>State's Exhibit 126</u>:  Post from Mr. Williams'[s] Instagram account, dated February 2, 2020, saying[,] "Bet bih love you foo [fuel pump emoji] same opps n[-]gga we still bruddas we gone always link in shoot a n[-]gga together."

- • Williams argues that because this Instagram post was created several days before Johnson's murder, it is not relevant and that the probative value is "nearly zero." Contrary to Williams's assertion, the post is relevant to show that there was a plan in place almost four days prior to Johnson's murder, that the plan was to shoot someone, and that this plan was communicated to the post's recipient "You a Rookie" (who was not further identified). Accordingly, the trial court did not abuse its discretion by admitting State's Exhibit 126.

(12) <u>State's Exhibit 127</u>:  Post from Mr. Williams'[s] Instagram account from the author "Brand Ambassador," dated February 6, 2020, saying[,] "I almost had Maine hit da wrong person."

- • Williams argues that this post is inadmissible under Rules 401, 402, 404, and 403 because an unknown person authored the post and because the message has nothing to do with Johnson, Holmes, or anyone involved in the case. Williams also takes aim at Officer Stelter's testimony interpreting "hit" to mean taking someone's life; Williams, however, did not object to that testimony and did not preserve that complaint.  Even assuming it was error for the trial court to admit this exhibit, Williams has not demonstrated (or even mentioned) how the admission of this exhibit harmed him.  We fail to see how Williams's substantial rights could have been impaired by the admission of this post that was merely sent to him and does not mention him or Johnson.  We therefore conclude that any error was harmless.

(13) <u>State's Exhibit 128</u>:  Post from Mr. Williams'[s] Instagram account, dated February 6, 2020[,] at 4:39 a.m., which says[,] "It's done GHG Kane [coffin emoji] told I gotchu [gas emoji]."

(14) <u>State's Exhibit 129</u>:  Post from Mr. Williams'[s] Instagram account, dated February 6, 2020, saying[,] "ik we don't fw each other, but tell splurge I handle GHG Kae fo em he [coffin emoji]."

(15) <u>State's Exhibit 131</u>:  Post from Mr. Williams'[s] Instagram account, dated February 6, 2020, saying[,] "lastnight on 60 & Errybody running dey mouths thru da streets & I wa was gone ducc off wi yuh till Inna am but u wa sleep."

(16) <u>State's Exhibit 132</u>:  Post from Mr. Williams'[s] Instagram account, dated February 6, 2020, saying "RATS" repeatedly, and indicating it was deleted by the user.

- • As to State's Exhibits 110, 128, 129, 131, and 132, Williams's brief raises no specific argument as to why they should not have been admitted.  After listing all the complained-of exhibits, Williams states that "each piece of evidence listed here was inadmissible under Rule 404[] and excludable under Rule 403" but provides no analysis, thus failing to comply with Texas Rule of Appellate Procedure 38.1(i).  *See* Tex. R. App. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.").

  Even assuming that Williams had properly briefed challenges to these exhibits, the five exhibits are relevant, not only because of what they show or state but because they are dated the same date as Johnson's murder.  The five exhibits are probative of Williams's involvement in Johnson's murder and his identity as a shooter.  It was therefore within the zone of reasonable disagreement for the trial court to admit these exhibits.

In addition to his relevancy arguments under Rules 401, 402, and 404, Williams also raises Rule 403 arguments, contending that the probative value of the complained-of evidence was substantially outweighed by the danger of unfair

37

prejudice. The State's brief sets forth a succinct Rule 403 analysis with which we agree:

> As demonstrated above, each piece of the complained[-]of evidence [sans State's Exhibits 125 and 127] served to connect Williams to the offense and to his accomplices. The State had a strong need for this evidence given the limited [non-accomplice-witness] evidence connecting Williams to the charged offense. Though some of the photographs and posts depicted Williams with firearms and discussed shootings, they were not emotionally charged or otherwise beyond the jury's comprehension. And Williams's trial counsel repeatedly referred to the evidence as "character evidence" and disparaged the State's use of the evidence in front of the jury. As such, the jury was properly equipped to evaluate the evidence. Lastly, the admission of this evidence comprised a total of [approximately twenty] pages of the entire record; it did not substantially divert the jury's focus from the charged offense. Considering the appropriate factors, it was within the zone of reasonable disagreement [for the trial court] to [have] overrule[d] Williams's Rule 403 objection[s] to the complained[-]of evidence . . . .

Having addressed the twenty exhibits and related testimony that Williams challenges, we hold that the trial court did not abuse its discretion by admitting the complained-of evidence, and we overrule Williams's fourth point.

## VI. Alleged Ineffective Assistance of Counsel

In his fifth point, Williams argues that his trial attorneys were ineffective for failing to object to the admission of extraneous-offense evidence when the State failed to provide the required notice prior to trial. Specifically, Williams contends that "the State gave zero notice of the extraneous offenses offered at trial"[11] and that although

---

[11]Williams's brief lists the complained-of extraneous-offense evidence as follows:

his trial attorneys "objected vigorously to most of this evidence, they never objected based on lack of notice." Based on the silent record and our conclusion that Williams's trial attorneys' failure to object on lack-of-notice grounds was not so outrageous that no competent attorney would have done the same, we hold that Williams has not shown that his trial attorneys were ineffective.

## A. Standard of Review

The Sixth Amendment guarantees a criminal defendant the effective assistance of counsel. *Ex parte Scott*, 541 S.W.3d 104, 114 (Tex. Crim. App. 2017); *see* U.S. Const. amend. VI. To establish ineffective assistance, an appellant must prove by a

---

(1) Mr. Williams fired a handgun at a gray car on February 5, 2020 (*See Point of Error Three*);

(2) Mr. Williams fired a handgun at an unknown drug dealer on February 5, 2020 (*See Point of Error Three*);

(3) Mr. Williams unlawfully possessed a firearm in 2019, in January 2020, and in February 2020 (*See Point of Error Four*);

(4) Mr. Williams assaulted his girlfriend, [M.D.], in January 2020 and "busted her lip" *(SX172)*;

(5) Mr. Williams threatened to shoot the kneecaps of [M.D.] and an unknown male[] on January 22, 2020 *(SX173)*;

(6) Mr. Williams unlawfully agreed to exchange firearms with others[] in December 2019, while being under the age of eighteen *(SX174)*;

(7) Mr. Williams threatened to assault [M.D.] on January 19, 2020 *(SX175)*; [and]

(8) Mr. Williams bragged about shooting someone and deleting his Instagram account on October 16, 2019 *(SX176).*

39

preponderance of the evidence that his counsel's representation was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Nava v. State*, 415 S.W.3d 289, 307 (Tex. Crim. App. 2013). The record must affirmatively demonstrate that the claim has merit. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

In evaluating counsel's effectiveness under the deficient-performance prong, we review the totality of the representation and the particular circumstances of the case to determine whether counsel provided reasonable assistance under all the circumstances and prevailing professional norms at the time of the alleged error. *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065; *Nava*, 415 S.W.3d at 307; *Thompson*, 9 S.W.3d at 813–14. Our review of counsel's representation is highly deferential, and we indulge a strong presumption that counsel's conduct was not deficient. *Nava*, 415 S.W.3d at 307–08.

An appellate court may not infer ineffective assistance simply from an unclear record or a record that does not show why counsel failed to do something. *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012); *Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007). Trial counsel "should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Menefield*, 363 S.W.3d at 593. If trial counsel did not have that opportunity, we should not conclude that counsel performed deficiently unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Nava*, 415 S.W.3d at 308. Direct

appeal is usually inadequate for raising an ineffective-assistance-of-counsel claim because the record generally does not show counsel's reasons for any alleged deficient performance. *See Menefield*, 363 S.W.3d at 592–93; *Thompson*, 9 S.W.3d at 813–14.

**B.    Analysis**

Here, Williams failed to raise ineffective assistance in his motion for new trial. The record is therefore silent as to why Williams's trial attorneys failed to object to the alleged lack of notice regarding the extraneous-offense evidence that the State presented at trial. Because the record is silent as to why they failed to object, it is insufficient to overcome the presumption that his trial attorneys' actions were part of a strategic plan. *See Rose v. State*, No. 02-21-00178-CR, 2023 WL 308170, at *10 (Tex. App.—Fort Worth Jan. 19, 2023, no pet.) (mem. op., not designated for publication) (citing *Chuong Duong Tong v. State*, 25 S.W.3d 707, 714 (Tex. Crim. App. 2000)).

Moreover, a question arises as to whether there was truly a lack-of-notice issue. As noted in the State's brief,

> [T]he Tarrant County District Attorney's Office has an "open file" policy and provides all records in its possession with defense counsel via the electronic discovery platform Techshare. At no point during trial or presently on appeal[] has Williams claimed that he did not have actual notice of the alleged extraneous-offense evidence used by the State at trial.
>
>      . . . Based on the record before this [c]ourt, it is apparent that Williams's trial counsel w[ere] actually aware of the extraneous[-]conduct evidence and prepared to answer it at trial; they were not surprised by its use[ because Williams's brief noted that his trial counsel were "particularly aware" of the prejudicial nature of the extraneous-offense evidence]. [Citations omitted.]

41

Because it is possible that Williams's trial attorneys had actual notice of the extraneous-offense evidence that the State presented at trial, we cannot conclude that their failure to object on lack-of-notice grounds was "so outrageous that no competent attorney would have engaged in it." *See Nava*, 415 S.W.3d at 308.

Accordingly, we overrule Williams's fifth point.

## VII. Conclusion

Having overruled Williams's five points, we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: May 22, 2025